# In the United States Court of Appeals
# For the Eleventh Circuit

CASE NO. 22-11421-J

---

JAMES ERIC MCDONOUGH,

*Appellant*,

v.

CARLOS GARCIA, GARLAND WRIGHT, AND THE CITY OF HOMESTEAD,

*Appellees.*

---

---

APPELLEE, CITY OF HOMESTEAD'S
PETITION FOR REHEARING EN BANC

---

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-CV-21986-FAM

---

**EDWARD G. GUEDES**
**MATTHEW H. MANDEL**
**ANNE R. FLANIGAN**
**WEISS SEROTA HELFMAN**
**COLE & BIERMAN, P.L.**
2800 Ponce de Leon Blvd.,
Suite 1200
Coral Gables, FL 33134
(305) 854-0800

*Counsel for Appellee, City of Homestead*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

### A.   Interested Persons

Appellee, City of Homestead respectfully submit this list of persons or entities that may have an interest in the outcome of this review:

**Appellant (and its currently known principals or other affiliated persons)**

1. James Eric McDonough.

**Appellees**

2. City of Homestead.

3. Carlos Garcia.

4. Garland Wright.

**Trial Judge, Attorneys, and Law Firms**

5. Hon. Federico A. Moreno (|District Judge).

6. Weiss Serota Helfman Cole & Bierman, P.L. (Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

7. Edward G. Guedes, Esq. (Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

8.  Matthew H. Mandel, Esq. (Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

9. Anne R. Flanigan, Esq. (Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

10. Alan Greenstein, Esq. (Counsel for Appellant, James Eric McDonough).

11. Alan Greenstein, P.A. (Counsel for Appellant, James Eric McDonough).

**B. Corporate Disclosure Statement**

Appellee, City of Homestead, is a municipal corporation of the State of Florida, and as a result, has no parent company, subsidiary, or affiliate company that has issued shares to the public.

_____/s/ *Edward G. Guedes*_____
Edward G. Guedes

**Counsel's Statement Regarding Rehearing En Banc**

We express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court: *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Good News Club v. Milford Central School*, 533 U.S. 98 (2001); *Rowe v. City of Cocoa*, 358 F.3d 800 (11th Cir. 2004); and *Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011).

Further, we express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance: Because comparable public meetings of elected officials occur hundreds of times every week throughout this Circuit, having clarity as to whether those meetings constitute limited public forums or designated public forums is a question of exceptional importance the Court should address.


/s/ _____*Edward G. Guedes*_____
    Attorney of Record for City of Homestead

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT....................................................C-1

COUNSEL'S STATEMENT REGARDING REHEARING EN
BANC ......................................................................................i

TABLE OF CONTENTS...................................................................... ii

TABLE OF CITATIONS ................................................................... iii

STATEMENT OF ISSUES MERITING EN BANC
CONSIDERATION..................................................................1

COURSE OF PROCEEDINGS AND DISPOSITION OF CASE ...........1

STATEMENT OF FACTS NECESSARY TO ARGUMENT OF
ISSUES ...................................................................................2

    A.    The precipitating events of July 27, 2016. ...........................2

    B.    The August 24, 2016, trespass warning and arrest. ............5

ARGUMENT ..................................................................................7

A.    Introduction..............................................................................7

B.    The panel's considered analysis. ..................................................8

CONCLUSION ...............................................................................12

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................13

CERTIFICATE OF SERVICE ............................................................13

OPINION .............................................................................Addendum

# TABLE OF CITATIONS

**Page**

## Cases

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) .............................................. i, 1

*Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213
    (11th Cir. 2018) ........................................................................11

*Good News Club v. Milford Central School*, 533 U.S. 98 (2001) .................. i, 1, 10

*Jones v. Heyman*, 888 F.2d 1328 (11th Cir. 1989) ..................................... 1, 8, 9, 11

*Keister v. Bell*, 879 F.3d 1282  (11th Cir. 2018) ........................................10

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ........................................ i, 1

*Rowe v. City of Cocoa*, 358 F.3d 800 (11th Cir. 2004) ........................................ i, 1

*United States v. Brown*, 342 F.3d 1245 (11th Cir. 2003) ........................................12

*United States v. Drury*, 396 F.3d 1143 (11th Cir. 2005) ...........................................7

*United States v. Duldulao*, 87 F.4th 1239 (11th Cir. 2023)....................................12

*United States v. Hogan*, 986 F.2d 1364 (11th Cir. 1993) ....................................9, 11

*United States v. Hurtado*, 89 F.4th 881 (11th Cir. 2023) .......................................11

*United States v. Steele*, 147 F.3d 1316 (11th Cir. 1998) ........................................11

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)................................................................. i, 1, 8

*Warren v. DeSantis*, Case No. No. 23-10459, --- F.4th ---, 2024 WL
    132518 (11th Cir. Jan. 11, 2024) ...............................................10

## Rules

Fed. R. App. Proc. 35(a) ............................................................................7

**PETITION FOR REHEARING EN BANC**

**STATEMENT OF ISSUES MERITING EN BANC CONSIDERATION**

Is the City Council meeting from which appellant was banned, where presentations are limited to matters "pertinent to the City," a limited public forum, consistent with *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015), *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009), *Good News Club v. Milford Central School*, 533 U.S. 98, 106-07 (2001), *Rowe v. City of Cocoa*, 358 F.3d 800 (11th Cir. 2004), and *Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011), or does this Court's precedent in *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989), mandate that the City Council meeting be treated as a designated public forum subject to a more stringent scrutiny analysis?

**COURSE OF PROCEEDINGS AND DISPOSITION OF CASE**

Appellant, James Eric McDonough ("McDonough") sued appellees, City of Homestead ("City"), and City police officers, Captain Garland Wright ("Captain Wright") and Sergeant Carlos Garcias ("Sgt. Garcia"), (collectively, "Appellees"), stemming from his conduct and comments during a City Council Meeting that led to his removal from the meeting and an order trespassing McDonough from City Hall. The operative pleading contained seven causes of action, only one of which is material to this petition: McDonough's First Amendment claim against the City in

Count 2, based on the City's issuance of a trespass order, banning McDonough from future City Council meetings until he sought in writing permission to return.

Following the completion of discovery, both sides filed cross-motions for summary judgment. On March 31, 2022, the district court granted Appellees' motion in full, denied McDonough's motion, and entered final judgment in favor of Appellees. McDonough timely appealed the summary judgment order and final judgment (with the exception of the district court's ruling as to Count 1, a First Amendment claim against Captain Wright). On January 10, 2024, following oral argument, the panel issued its opinion affirming the district court on two counts and reversing on the remaining four, including Count 2, the First Amendment claim based on the trespass order.

## STATEMENT OF FACTS NECESSARY TO ARGUMENT OF ISSUES

### A.     The precipitating events of July 27, 2016.

During City Council meetings, there is a public comment portion during which members of the public may address the Council for up to three minutes on matters pertinent to the City.  App'x Vol. I, Tab 56-6; Supp. App'x Vol. II, Tab 64, ¶ 2; Supp. App'x Vol. III, Tab 69, ¶ 2. Slanderous remarks, unduly repetitive comments, or behavior that "disrupts or impedes the orderly conduct of the meeting, as determined by the Mayor and/or Sergeant at Arms[,]" are prohibited. App'x Vol. I, Tab 56-6, at 4-6. Signs and placards are prohibited in the Council

Chamber, and "clapping, applauding, heckling or verbal outbursts in support or opposition to a speaker or his or her remarks" are similarly not permitted during the public comment portion—or any portion—of a City Council meeting. App'x Vol. I, Tab 56-6, at 5. The public comment portion of each meeting is governed by rules of decorum, the validity of which McDonough did not challenge below. App'x Vol. I, Tab 56-6. Since January 2015, McDonough has regularly attended City Council meetings and, between 2015 and 2017, addressed the City Council approximately 12 to 16 times (and continues to do so). Supp App'x Vol. II, Tab 64-2, 36:8-38:16.

On July 27, 2016, McDonough spoke at a City Council meeting during the public comment portion of the meeting. Supp. App'x Vol. III, Tab 94.[1] At that meeting, Captain Wright served as Sergeant-at-Arms and was, therefore, responsible for the enforcement of the City's Rules of Decorum, including the removal of disruptive or unruly individuals. Supp. App'x Vol. II, Tab 64-2, 73:3-7; App'x Vol. I, Tab 56-6. At the conclusion of McDonough's statements, he ended with the following statement directed to Councilman Maldonado (as well as a physical gesture towards him):

---

[1]     Tab 94 is a conventionally filed thumb drive containing one cell-phone video (recorded by McDonough).

> The last point I'd like to hit off with is, Mr. Maldonado, you know I'd appreciate if you got something to say to me, you say it to my face. You don't have to talk about it behind my back in public and talk to other people. I'd really appreciate that.

Supp App'x Vol. III, Tab 94, 0:20-2:50.

In Captain Wright's experience as a law enforcement officer, which includes sixteen years with the City and four years as a corrections officer overseeing prisoners in custody for violent threats and acts, he perceived McDonough's challenge to Councilman Maldonado as a threat or challenge for a physical confrontation. Supp. App'x Vol. III, Tab 64, ¶¶ 2-7. Captain Wright has personally observed or investigated violent confrontations that were immediately preceded by a challenge for a statement "to be made to [one's] face." *Id.*, ¶ 5. In this particular instance, based on McDonough's tone, gestures, and statement, Captain Wright perceived his comment as a violation of the Rules of Decorum. App'x Vol. I, Tab 56-12, 19:12-20:2, 22:11-17; App'x Vol. I, Tab 56-6; Supp. App'x Vol. III, Tab 64-4, ¶ 7. Accordingly, Captain Wright approached McDonough at the podium and asked him to leave the meeting, just as McDonough was finishing his comments and stepping away from the podium. Supp. App'x Vol. III, Tab 94, 0:20-2:50; Supp. App'x Vol. III, Tab 64-4, ¶¶ 8-9.

Captain Wright then escorted McDonough out of the Council Chamber, while McDonough filmed on his cellphone and shouted, "I am going to sue the shit

4

out of you dumb ass." Supp App'x Vol. III, Tab 94, 3:08-3:13. Several individuals sitting in the Council Chamber can be seen turning around to watch McDonough as he yelled at Captain Wright while exiting. *Id.*; App'x Vol. I, Tab 56-12, 71:1-72:15. McDonough also shouted, "Now we got Homestead police officers again violating the First Amendment rights because they are fucking idiots and they don't know shit. Absolutely ridiculous." Supp App'x Vol. III, Tab 94, 3:13-30.

Captain Wright did not issue a trespass warning to McDonough on July 27, 2016. *See generally* Supp. App'x Vol. III, Tab 94; App'x Vol. I, Tab 56-12, 26:11-13. Ultimately, McDonough did not challenge the propriety of Captain Wright's actions on that day.

### B. The August 24, 2016, trespass warning and arrest.

Following McDonough's conduct on July 27, 2016, Captain DeJohn, a member of the City's police command staff, inquired with the Miami-Dade State Attorney's Office ("SAO") whether an officer may issue a trespass warning to an individual when that person attempts to return to the premises and after conduct meriting the warning has already occurred. Supp. App'x Vol. III, Tab 64-6, ¶¶ 14-15. The SAO advised that the City could issue a trespass warning after the fact. *Id.*

Section 17-4 of the City Code of Ordinances makes trespassing or entering City property without the express or implied consent of the City unlawful. Supp App'x Vol. III, Tab 64-5. Additionally, police officers have the authority "to

5

preserve order and maintain the peace and dignity of the [C]ity, and to make arrests of offenders against the ordinances and [the City Code,]" without prior approval or ratification of any department heads. Supp. App'x Vol. III, Tab 64-7.

After Captain DeJohn's consultation with the SAO, the decision was made, based on McDonough's behavior on July 27, 2016, to issue a trespass warning to him upon his return to City Hall. Supp. App'x Vol. III, Tab 64-6, ¶¶ 14-15; App'x Vol. I, Tab 56-12, 28:22-30:16, 73:1-74:1. This decision was based on his perceived threat to Councilman Maldonado and his actions (which included disruptive behavior and cursing) while exiting the City Council Chamber. *Id.* After the decision was made to trespass McDonough, Chief Rolle was informed of the decision, prior to the August 24, 2016 City Council Meeting, that McDonough was going to be trespassed based upon his behavior at the July 27, 2016 meeting and after consultation with the SAO. App'x Vol. I, Tab 56-12, 28:22-29:23, 73:1-74:1; Supp. App'x Vol. I, Tab 56-8, 22:2-24:16.

McDonough returned to City Hall on August 24, 2016. Supp. App'x Vol. II, Tab 64-2, 149:2-5. As he approached City Hall, he began recording on his cell phone. Supp. App'x Vol. II, Tab 64-2, 150:22-25; App'x Vol. I, Tab 58, Exh. Q, 0:00-0:30. When McDonough entered City Hall, he was approached by Captain Wright, who directed McDonough outside. Supp. App'x Vol. II, Tab 64-2, 155:2-6; App'x Vol. I, Tab 58, Exh. Q, 0:00-0:30. Once outside, Captain Wright verbally

Weiss Serota Helfman Cole & Bierman, P.L.

issued McDonough a trespass warning for City Hall, based on his behavior at the July 27, 2016 City Council meeting and in reliance on the advice of the SAO. Supp. App'x Vol. II, Tab 64-2, 155:22-25; App'x Vol. I, Tab 56-12, 36:3-5, 73:19-74:13, App'x Vol. I, Tab 58, Exh. Q, 0:31-0:40. Captain Wright also informed McDonough that he could "get permission to come back" by writing a letter.[2] App'x Vol. I, Tab No. 58, Exh. Q, 0:41-0:47. At no point while he was speaking with Captain Wright was McDonough threatened with arrest or other adverse action if he were to come back to City Hall. *Id.*

## ARGUMENT

### A. Introduction.

Rehearing en banc is appropriate to maintain uniformity in the Court's jurisprudence. *United States v. Drury*, 396 F.3d 1143, 1144 (11th Cir. 2005) (en banc) ("Rehearing en banc is disfavored and ordinarily will not be ordered unless it is necessary to maintain uniformity in the Court's decisions or … if the proceeding involves a question of exceptional importance.") (quoting Fed. R. App. Proc. 35(a); citing 11th Cir. R. 35–3). As more fully elaborated below, the panel in reversing the district court apparently believed that its conclusion on the above-

---

[2] Appellant never wrote a letter to obtain permission to return, but nonetheless resumed attending City Council meetings in December 2016 (without incident). Supp. App'x Vol. I, Tab 64-3, 241:7-242:7.

referenced issue would be at odds with the United States Supreme Court's resolution of the issue, based on its current precedents. But for the prior panel precedent in *Jones*, the panel might well have aligned its analysis with *Walker* and similar decisions and applied a wholly different level of scrutiny to the City's preclusion of Mr. McDonough from City Council meetings. Op. at 19-20.

**B. The panel's considered analysis.**

The posture of this appeal and the panel's conceded struggles with determining whether the City Council meeting is a limited public forum cry out for rehearing en banc. Indeed, it is unusual that a panel explicitly twice predicts that the United States Supreme Court would reach one conclusion—Op. at 2 ("It seems likely that the Supreme Court would treat the Homestead City Council meeting as a limited public forum.") and *id.* at 20 ("Under the Supreme Court's current framework, because the city council's meeting procedures limit the public comment period to matters 'pertinent to the City,' it would appear that the city council meeting is a limited public forum.")—yet reaches a contrary conclusion because it felt bound by panel precedent. *Id.* at 22 ("Because 'we cannot distinguish the facts' of *Jones*, we are obligated to apply it as 'the precedent of the first panel to address the relevant issue.'"). The panel described its conclusion that the City Council meeting is a "designated public forum" as "uncomfortable because if we were starting from scratch it might be more appropriate to define city

Weiss Serota Helfman Cole & Bierman, P.L.

council meetings as limited public forums, where regulations survive so long as they are reasonable and viewpoint neutral." *Id.* at 9.

More striking still, the panel acknowledges that this Court's jurisprudence on the question of what constitutes a limited public form has not always tracked consistently with the jurisprudence of the United States Supreme Court. *Id.* at 2 ("While the Supreme Court's public forum framework has evolved substantially over the last forty years, our precedents have failed to keep pace."); 15 ("This Circuit's public forum doctrine has also evolved—just not always in tandem with the Supreme Court's."). And yet, despite the considerable misgivings expressed by the panel, and its prediction as to the Supreme Court's current resolution of the forum inquiry, the panel reversed based upon the "earliest panel precedent" rule:

> Our earliest panel precedent treats a city council meeting reserved for the discussion of limited subjects as a designated public forum, so the comparatively tougher standards for analyzing speech restrictions in that kind of forum must apply here. Following those standards, we reverse the district court's grant of summary judgment for the City on the speech ban.
>
> *     *     *
>
> The prior-panel precedent rule directs one course: it is "the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless *and until that holding is overruled en banc*, or by the Supreme Court." *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993). Yes, "a subsequent panel is not obligated to follow a prior panel's decision where an intervening Supreme Court decision establishes that the prior panel decision is wrong." *Id*. But we cannot comfortably say that *Jones* and *Crowder* were abrogated by the Supreme Court's

Weiss Serota Helfman Cole & Bierman, P.L.

subsequent change in its treatment of limited public forums, finalized in *Good News Club*.

Op. at 3, 20-21 (emphasis added).

Conspicuously, the panel's decision to abide by the earliest panel precedent had genuine analytical consequences in how the appeal was decided. For example, the panel could have (as many appellate panels have previously done in the First Amendment context) foregone deciding which was the controlling analytical framework by concluding that under *either* analysis, the City's defense would fail. *See, e.g., Warren v. DeSantis*, Case No. No. 23-10459, --- F.4th ---, 2024 WL 132518, *9 (11th Cir. Jan. 11, 2024) (declining to decide "whether a factual finding about what motivated an employer to take an adverse employment action is [reviewed] *de novo* or for clear error"); *Keister v. Bell*, 879 F.3d 1282, 1287 n.3 (11th Cir. 2018) ("[W]e need not decide that question. Under either standard of review—clear error or *de novo*—it is apparent that the intersection is indeed within the heart of UA's campus."). But it did not do so. Instead, the panel applied the "tougher standards for analyzing speech restrictions" and "applying that standard," reversed the district court. Op. at 3.

But the panel's having made the choice between competing standards in no way undermines the need for en banc review. As the panel all but concedes:

That means all of our not-quite-reconcilable precedents are not-quite-overruled. There is no way to chart a new path through our caselaw

> consistent with all of our precedents unless we twist "a case in such a
> way as to avoid the more troublesome prospect of dealing with the
> conflict of authority." *Hogan*, 986 F.2d at 1369. Because "we cannot
> distinguish the facts" of *Jones*, we are obligated to apply it as "the
> precedent of the first panel to address the relevant issue."
> *Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1227
> (11th Cir. 2018).

*Id.* at 21-22. The panel then proceeded to apply the more stringent First
Amendment scrutiny to what the parties agreed was the City's content-neutral
restrictions. *Id.* at 22-24. *See also id.* at 19 ("Both parties agree that the trespass
order here was content neutral.").

The City will refrain from further belaboring the panel's struggles to chart
an analytical course through the sea of inconsistent precedents. What is clear,
nonetheless, is that the panel struggled mightily to reach a satisfactory conclusion,
even as it believed its conclusion would be at odds with the United States Supreme
Court's current determination of the same issue. It is equally clear that this Court,
sitting en banc, does not suffer from the limitations the panel confronted. *See, e.g.,*
*United States v. Hurtado*, 89 F.4th 881, 895 (11th Cir. 2023) ("Under our prior
precedent rule, a panel cannot overrule a prior one's holding even [if] convinced it
is wrong.") (citing *United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir.
1998) (en banc)). The Court en banc may right the ship, address (or even recede
from) *Jones* in light of subsequent Supreme Court precedents, and reconcile this
Court's jurisprudence while aligning it with Supreme Court precedent. *United*

Weiss Serota Helfman Cole & Bierman, P.L.

*States v. Duldulao*, 87 F.4th 1239, 1253 (11th Cir. 2023) ("[O]nly the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision.") (quoting *United States v. Brown*, 342 F.3d 1245, 1246 (11th Cir. 2003)).

## CONCLUSION

For the reasons set forth herein, the City respectfully requests that the Court grant rehearing en banc, vacate the panel's decision on the First Amendment claim in Count 2, and allow the parties to fully brief the issue presented above.

Respectfully submitted,

EDWARD G. GUEDES, ESQ. (FBN 768103)
MATTHEW MANDEL, ESQ. (FBN 147303)
ANNE R. FLANIGAN, ESQ. (FBN 118399)
WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
2800 Ponce de Leon Blvd.
Suite 1200
Coral Gables, FL 33134
Telephone: (305) 854-0800
eguedes@wsh-law.com
szavala@wsh-law.com
mmandel@wsh-law.com
lbrewley@wsh-law.com
aflanigan@wsh-law.com

*Counsel for Appellee, City of Homestead*

By: _____ /s/ *Edward G. Guedes* _____

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This petition for panel rehearing complies with the type-volume limit of Fed. R. App. P. 37(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 2,787 words. This petition for panel rehearing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-stye requirements of Fed. R. App. P. 32(a)(6) because this document is in a proportionally spaced typeface, Times New Roman 14-point.

_____*/s/ Edward G. Guedes*_____


**CERTIFICATE OF SERVICE**

I, Edward G. Guedes, counsel for Appellees and a member of the Bar of this Court, certify that, on January 30, 2024, a copy of the foregoing petition for panel rehearing was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

_____*/s/ Edward G. Guedes*_____

# ADDENDUM

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11421

_____

JAMES ERIC MCDONOUGH,

                                             Plaintiff-Appellant,

*versus*

CARLOS GARCIA,
GARLAND WRIGHT,
individually,
CITY OF HOMESTEAD,
a political subdivision of the State of Florida,

                                             Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-21986-FAM

_____

Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

GRANT, Circuit Judge:

James McDonough, a self-styled citizen activist, was escorted out of a city council meeting in Homestead, Florida after he verbally attacked one of the council's members. That removal, which the parties now agree was legal, was followed by a series of events that do not benefit from a similar posture of détente—an arrest for disorderly conduct, an indefinite ban from city hall, and an arrest for cyberstalking.

This lawsuit challenges all three. McDonough first says the City and its officials violated the First Amendment by banning him from future meetings. Before we can consider that argument, we need to know what kind of public forum those meetings are, because the City's ability to restrict McDonough's speech depends almost entirely on the answer to that question. But that inquiry highlights an unresolved tension in our Circuit's First Amendment jurisprudence. While the Supreme Court's public forum framework has evolved substantially over the last forty years, our precedents have failed to keep pace.

It seems likely that the Supreme Court would treat the Homestead City Council meeting as a limited public forum. That

Court, however, has not specifically considered city council meetings—and this one has.  Our earliest panel precedent treats a city council meeting reserved for the discussion of limited subjects as a designated public forum, so the comparatively tougher standards for analyzing speech restrictions in that kind of forum must apply here.  Following those standards, we reverse the district court's grant of summary judgment for the City on the speech ban.  But we affirm the district court's summary judgment decision finding qualified immunity for the officer who enforced the City's ban.

Moving on to the false-arrest counts, McDonough first argues that he should not have been arrested for disorderly conduct after he was removed from City Hall—even accepting as true the officers' claims that he was grabbing his crotch and loudly cursing at them.  Here, we agree.  Our precedents show that yelling, cursing, and making obscene gestures toward police officers, without more, does not amount to probable cause for a disorderly conduct arrest.  The arresting officers should have known this too, so we deny qualified immunity.

McDonough also argues that the City did not have probable cause to arrest him for cyberstalking.  This time we disagree.  Though it is a close question, it was not unreasonable for the City to interpret Florida's cyberstalking statute as barring McDonough from targeting one of its officers with his series of posts.  That means the City did have probable cause to arrest him for cyberstalking.  We thus affirm in part and reverse in part.

## I.

Homestead, Florida holds monthly city council meetings at its City Hall.  During the comment portion of these meetings, members of the public are invited to speak for three minutes at a time on any matters "pertinent to the City."  James McDonough was a regular, attending and speaking at more than half of the meetings held between 2015 and 2017.  But it did not always go smoothly; the City had stopped him from completing his remarks several times.

Things came to a head during the July 2016 meeting. McDonough rose to address the council, and spoke for about two-and-a-half minutes without incident.  He touched on various subjects, including alleged police misconduct, body cameras, and claims of nepotism within the police department.  But toward the end of his allotted time, things took a turn for the worse. McDonough loudly confronted a city councilman, launching a personal challenge: "The last point I'd like to hit off with is, Mr. Maldonado, you know I'd appreciate it if you got something to say to me, you can come say it in my face, and you don't have to talk about me behind my back in public to other people."  Sergeant Garland Wright, who later testified that he took these comments as a threat, quickly approached the podium and ordered McDonough to leave.  He characterized his action as a de-escalatory tactic.

McDonough complied—at least with the instruction to leave.  As he walked out of the auditorium, he threatened to "su[e]

the shit" out of Wright, and then annotated his departure with a description of Homestead police that was laced with curse words. Meanwhile, the city council meeting continued without further disruption.

A month later, McDonough was back; he planned to attend the August city council meeting.  But as soon as he arrived, Sergeant Wright intercepted him.  He informed McDonough that the City had issued a trespass order, which amounted to a blanket ban from the premises—including during city council meetings. When McDonough asked how he could get the ban lifted, Sergeant Wright told him to "write a letter."

So far the exchange had been cordial, but as McDonough walked away he flipped his middle finger and said, "I'm leaving buddy, bye-bye."  What happened next is debated.  Wright claims he observed McDonough stop, grab his crotch, and say "fuck you." For his part, McDonough denies cursing or grabbing his crotch, though he admitted it was "possible" that Wright could have mistaken his taking his phone out for the more vulgar gesture.[1] Either way, the handful of other bystanders in the parking lot at the time seemed unconcerned about the interaction.

Sergeant Wright, however, did not take McDonough's response lightly—he ordered him to stop and then arrested him for

---

[1] Because McDonough admits that Wright could have believed he saw him grabbing his crotch, we assume for this opinion that it happened.  Even so, we note that the videos do not show McDonough doing anything resembling a crotch grab during this encounter.

disorderly conduct.  Sergeant Carlos Garcia arrived on the scene later.  After speaking with the arresting officers and reviewing surveillance video of the incident, Garcia informed McDonough that he was also under arrest for trespassing.  Sergeant Garcia prepared McDonough's arrest form, charging him with both crimes.  Officers then took McDonough to the police station, where he was held overnight before being released on bond the next day.

After his release, McDonough decided to hash out his frustrations online.  Over the course of about fifteen minutes, he made three posts on a law-enforcement blog referencing his August arrest, identifying by name one of the officers involved.  He also posted a link to a public YouTube video featuring that officer's public comments against body cameras.  McDonough then challenged the same officer to wear a body camera, calling him a "frigging coward," a "slipttail [sic]," and a "giant twat."  He warned that "any further retaliation" would be dealt with "swiftly, harsly [sic], and lawfully."  McDonough closed by emphasizing that he would "be blasting [the officer's] address."

These blog posts did not sit well with the targeted officer, who later testified that he feared for his own safety and his family's.  The City again arrested McDonough, this time for cyberstalking and witness tampering.  After a Miami-Dade Criminal Court judge agreed that probable cause supported the cyberstalking charge (but not the witness tampering one), McDonough bonded out.

The state attorney eventually dropped all criminal charges against McDonough. But that was not the end of the matter—once the state criminal case was over, this federal civil case began. McDonough sued the City of Homestead and four police officers involved in his arrests. After the district court dismissed claims against two of the officers, the lawsuit proceeded to summary judgment on the seven remaining counts. Count 1 alleged that Sergeant Wright violated McDonough's First Amendment rights when he removed him from the July city council meeting. Counts 2 and 3 alleged that the City and Wright, respectively, violated McDonough's First Amendment rights when Wright issued the August trespass order barring McDonough from future meetings. Count 4 alleged false arrest by the City when Wright and Sergeant Garcia arrested McDonough for disorderly conduct; Counts 5 and 6 alleged violations of the Fourth Amendment by Wright and Garcia, respectively, for the same. Finally, Count 7 alleged false arrest by the City for the September cyberstalking arrest. The district court found for the defendants on all counts.

McDonough has abandoned Count 1, but appeals the district court's rulings against Counts 2 through 7.

## II.

We review a district court's order granting summary judgment de novo. *Brown v. Nexus Bus. Sols., LLC*, 29 F.4th 1315, 1317 (11th Cir. 2022). "We view the evidence in the light most favorable to the nonmoving party, and we draw all justifiable inferences in that party's favor." *Id.* at 1317–18 (quotation

omitted).  "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* at 1317 (quoting Fed. R. Civ. P. 56(a)).

## III.

The first issue we consider is whether the City violated McDonough's First Amendment rights when it barred him from attending city council meetings.  We have long understood the commonsense point that the Constitution does not require the government to "grant access to all who wish to exercise their right to free speech," no matter the setting, "without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985).  Disallowing any limits whatsoever in all government spaces would often lead to chaos, and could even keep the government from fulfilling its lawful functions.  But that is not a license to evade the First Amendment, which demands a close look when the government restricts speech.  Enter forum analysis, which considers "when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes."  *Id.* at 800.

The government's ability to impose restrictions on speech varies depending on the nature of the forum.  *See Keister v. Bell*, 29 F.4th 1239, 1251 (11th Cir. 2022); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983).  So what type of forum are

the city council meetings here, and what is the proper legal test for the City's speech restrictions? These questions seem straightforward. But they are not—at least not here and not now. The histories of First Amendment public forum doctrines here and in the Supreme Court are jagged, and they lead us to the somewhat uncomfortable conclusion that in this Circuit a city council meeting like the one McDonough wished to attend is a designated public forum.

We call that conclusion uncomfortable because if we were starting from scratch it might be more appropriate to define city council meetings as limited public forums, where regulations survive so long as they are reasonable and viewpoint neutral. But our Court's earliest relevant precedent held that a city council meeting just like the one here was a designated public forum, which means the government's authority to limit speech is itself quite limited. Because that same holding was reaffirmed after Supreme Court precedents that pointed to—but did not demand— a different answer, we are bound by it here.

## A.

The Supreme Court first outlined public forum doctrine in *Perry Education Association v. Perry Local Educators' Association.* Synthesizing several decades' worth of First Amendment jurisprudence, the Court set out three categories and explained that the government's ability to restrict expressive activity would be different in each one. 460 U.S. at 45–46.

The first was the traditional public forum—places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 45 (quotation omitted). The quintessential examples are streets and parks. *Id.* Unsurprisingly, in this kind of forum the government's ability to restrict speech is highly constrained. Regulations that depend on the content of speech need to satisfy strict scrutiny, which means they must be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Id.* As for content-neutral "time, place, and manner" regulations—when, where, and how speech can happen, regardless of the speaker's message—the standard is somewhat looser. Even so, such rules must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*[2]

Next was the designated public forum, or "public property which the State has opened for use by the public as a place for expressive activity." *Id.* Examples given by *Perry* include

---

[2] Those two standards, though similarly worded, are different. For a time, place, and manner restriction to be "narrowly tailored," it "need not be the least restrictive or least intrusive means of" serving "the government's legitimate, content-neutral interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Instead, "narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" and it does not "burden substantially more speech than is necessary to further" that interest. *Id.* at 799 (alteration adopted and quotation omitted).

"university meeting facilities," "school board meeting[s]," and "municipal theater[s]." *Id.* at 45–46. These forums and others like them need not be held open indefinitely for public speech, the Supreme Court said, but when the government does choose to open a designated public forum, it is bound to respect the same First Amendment standards that applied in traditional public forums. *Id.* at 46.

The third and final category described in *Perry* was the nonpublic forum. This type of forum is, as the name suggests, not really a public forum at all, and includes government property that "is not by tradition or designation a forum for public communication." *Id.* The First Amendment, after all, "does not guarantee access to property simply because it is owned or controlled by the government." *Id.* (quotation omitted). The internal school mail facility at issue in *Perry* was one such nonpublic forum; other examples are mailboxes, military bases, and jails. *Id.*; *see also U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 128–29 (1981); *Greer v. Spock*, 424 U.S. 828, 838 (1976); *Adderley v. Florida*, 385 U.S. 39, 47–48 (1966). For these, the Court said, the state can impose "reasonable" regulations on speech in order to "reserve the forum for its intended purposes," but only if those restrictions are viewpoint neutral. *Perry*, 460 U.S. at 46.

The Supreme Court followed this tripartite framework without interruption for about a decade, until *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995). There, the Supreme Court made an important shift—though without saying

so—setting out a fourth category, the limited public forum. *Perry* had not recognized a separate category of "limited public forums." But it did use that term to describe a subset of designated public forums, those "created for a limited purpose such as use by certain groups, or for the discussion of certain subjects." *Perry*, 460 U.S. at 46 n.7 (citations omitted).   To underscore the overlap, *Perry* recycled two of its examples of designated public forums as also being limited public forums: university meeting facilities and school board meetings. *See id.*   And for these meetings, the government needed to respect the same First Amendment boundaries as in other designated public forums. *See id.* at 45–46, 46 n.7.

But in *Rosenberger*, the Court moved limited public forums into the nonpublic forum bucket. *Rosenberger* explained that in a "limited public forum"—one created "for certain groups or for the discussion of certain topics"—the government could enforce speech restrictions that were "reasonable in light of the purpose served by the forum" and did not discriminate on the basis of viewpoint. 515 U.S. at 829 (quotation omitted). This was the same test it had offered before for nonpublic forums. *See Perry*, 460 U.S. at 46.

*Rosenberger* cited two post-*Perry* cases to support this point. *See* 515 U.S. at 829 (citing *Cornelius*, 473 U.S. 788; and *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)). But both of them had outlined the same three-part forum analysis as *Perry*—including a recognition that the stricter standard associated with

traditional public forums applied when the government designated a forum for open public expression.[3]  *See Cornelius*, 473 U.S. at 800; *Lamb's Chapel*, 508 U.S. at 390–93.  *Cornelius*, like *Perry*, identified school board meetings and municipal auditoriums as examples of designated public forums.[4]  *Cornelius*, 473 U.S. at 803.  It reiterated that the reasonable-and-viewpoint-neutral test applied for "nonpublic forum[s]."  *See id.* at 806.  *Lamb's Chapel*, for its part, simply quoted *Cornelius* for the same rule.  508 U.S. at 392–93.  Neither established a new category of "limited public forums."

*Rosenberger* thus represented a break from *Perry* and its progeny.  Where *Perry* described limited public forums as a subset of designated public forums, *Rosenberger* said the test applied in limited public forums was the same as the test used in nonpublic forums.  So what probably read as a minor conceptual shift—after all, these categories are often based on a matter of degree—turned out to have major implications for the analysis courts use and the standards we set.

This doctrinal change came with its own growing pains.  Just three years later, the Court appeared to walk back *Rosenberger's*

---

[3] Same with *International Society for Krishna Consciousness, Inc. v. Lee*, which repeated *Perry's* three-part framework but was uncited in *Rosenberger*.  *See* 505 U.S. 672, 678–79 (1992).

[4] The *Cornelius* dissent, for what it is worth, explicitly used the term "limited public form" as a synonym for designated public forum, and there is no sign that the majority disagreed with that characterization.  *See Cornelius*, 473 U.S. at 813 (Blackmun, J., dissenting) (citing *Perry*, 460 U.S. at 48).

creation of the limited public forum.  In *Arkansas Educational Television Commission v. Forbes*, the Court briefly returned to *Perry*'s three categories: traditional public forum, designated public forum, and nonpublic forum.  523 U.S. 666, 677–78 (1998).  The *Forbes* Court described a forum open only to "a particular class of speakers" as a type of designated public forum—consistent with *Perry* but contrary to *Rosenberger*, which called a forum reserved "for certain groups" a limited public forum.  *Id*. at 678; *see Perry*, 460 U.S. at 45–46, 46 n.7; *Rosenberger*, 515 U.S. at 829.

But in 2001, *Good News Club v. Milford Central School* cemented *Rosenberger*'s change.  533 U.S. 98.  The Supreme Court reaffirmed *Rosenberger*'s shift, applying the reasonable-and-viewpoint-neutral standard to restrictions in a limited public forum.  *See id*. at 106–07.  The Court maintained its earlier standard for restrictions on speech in traditional or "open" (an apparent synonym for designated) public forums, describing those categories as "subject to stricter scrutiny than are restrictions in a limited public forum."  *Id*. at 106.  So *Perry*'s early characterization of limited public forums as a specific subset of designated public forum was dead and gone—at least at the Supreme Court.

The characterization of the limited public forum as a category distinct from the designated public forum remains in force at the Supreme Court.  So does the application of the reasonable-and-viewpoint-neutral standard to restrictions on speech within that kind of forum.  *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *Christian Legal Soc'y Chapter of the Univ. of Cal.,*

*Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 (2010). And in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the Court set out the limited public forum as a category independent from both designated public forums and nonpublic forums. *See* 576 U.S. 200, 215–16 (2015). That leaves, for today, four kinds of forums recognized by the Supreme Court: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum.[5]

## B.

This Circuit's public forum doctrine has also evolved—just not always in tandem with the Supreme Court's. In 1989 we deemed a city commission meeting, which was open for public comment on agenda items, a designated public forum. *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989). Consistent with *Perry*, we held that content-based restrictions were subject to strict

---

[5] The Supreme Court has also said at times that there are only three, using the categories of "limited public forum" and "nonpublic forum" interchangeably. *See Christian Legal Soc'y*, 561 U.S. at 679 n.11 (recognizing traditional public forums, designated public forums, and limited public forums); *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (recognizing traditional public forums, designated public forums, and nonpublic forums); *see also Am. Freedom Def. Initiative v. King Cnty.*, 136 S. Ct. 1022, 1022 (2016) (Thomas, J., dissenting from denial of certiorari) (noting that a "limited public forum" is "also called a nonpublic forum"). Perhaps it is irrelevant if the same test is applied to speech restrictions in either setting. But in any event, whether "the limited public forum" and the nonpublic forum are "distinct type[s] or merely a variant of one" another "is not important to our analysis." *Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n*, 942 F.3d 1215, 1237 n.5 (11th Cir. 2019).

scrutiny in this designated public forum, while content-neutral, time, place, and manner restrictions needed to be "narrowly drawn to achieve a significant governmental interest" and "allow communication through other channels." *Id.* So far so good.

Four years later, we correctly read *Perry* to say that one "kind of designated public forum is the limited public forum." *Crowder v. Hous. Auth. of Atlanta*, 990 F.2d 586, 591 (11th Cir. 1993). We went on to hold that an auditorium in a public housing unit "was a limited public forum" because it was open for a wide range of activities. *Id.* All remained well because at that time both this Court and the Supreme Court considered limited public forums a type of designated public forum, subject to the same test. We struck down the regulations limiting the auditorium's use for Bible studies. *See id.* at 592–93.

Trouble held off for a little over a decade.[6]  In 2004, nine years after *Rosenberger* made clear that restrictions in limited public forums should be evaluated for reasonableness and viewpoint neutrality (and three years after *Good News Club* did the same), this Court held that city council meetings were limited public forums.

---

[6] In 2003, sitting en banc, we explained that there were three forum categories: traditional public forum, designated public forum, and nonpublic forum. *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1306 n.9 (11th Cir. 2003) (en banc). We wrote that strict scrutiny applied to content-based restrictions in traditional and designated public forums, while the reasonable-and-viewpoint-neutral test applied to restrictions in nonpublic forums. *Id.* at 1306–07. We made no mention at all of the limited public forum.

*Rowe v. City of Cocoa*, 358 F.3d 800, 802 (11th Cir. 2004) (quoting *Crowder*, 990 F.2d at 591). No problem there. But *Rowe* applied the designated forum test rather than the nonpublic forum test to this allegedly limited forum, saying that content-neutral restrictions on the time, place, and manner of speech "must be narrowly tailored to serve a significant government interest." *Id.* at 802–03 (quotation omitted).[7] This was consistent with *Perry*, as well as *Jones* and *Crowder*, but not with the more recent *Rosenberger* and *Good News Club*, which would have reviewed restrictions in a limited public forum only for viewpoint neutrality and reasonableness in light of the forum's purpose. In other words, our treatment of limited public forums diverged from that of the Supreme Court.

By 2011, we had partially corrected course. In *Bloedorn v. Grube*, a case about a non-student seeking to preach on a public university's campus, we articulated the difference between public, designated, and limited forums and described the tests applicable to each consistent with the Supreme Court's latest explanation as laid out in *Good News Club*, *Pleasant Grove City*, and *Christian Legal Society*. *See* 631 F.3d 1218, 1225–26, 1230–32 (11th Cir. 2011). The university's sidewalks, pedestrian mall, and rotunda were limited public forums because they were limited to use only by university community members, while the Free Speech Area open to outside

---

[7] *Rowe* did, we note, characterize the regulations that it approved as "reasonable and viewpoint neutral" in its concluding paragraph, despite having applied a different test in the analysis. *Rowe*, 358 F.3d at 804.

speakers was a designated public forum. *Id.* at 1232–34. We concluded that the university's ban on outside speakers in the limited public forums reserved for university members was a reasonable, viewpoint-neutral restriction. *See id.* at 1235. And the requirement that outside speakers seek a permit to access the Free Speech Area was upheld as a content-neutral, time, place, and manner restriction narrowly tailored to the university's significant interests in regulating competing uses of the space and maintaining campus safety, leaving open ample alternative channels for speech. *See id.* at 1236–42. That was all consistent with *Good News Club*. The problem is that *Bloedorn* did not cite or explain away *Rowe*, which came after *Good News Club* but still applied our earlier approach for limited public forums, categorizing them with designated public forums rather than nonpublic.

So, in the post-*Good News Club* era, this Court has had two inconsistent but concurrent approaches to analyzing limited public forums: *Rowe*, which requires content-neutral restrictions in a limited public forum to be narrowly tailored to a significant governmental interest (and implicitly requires strict scrutiny for content-based restrictions), and *Bloedorn*, which reviews all restrictions only for viewpoint-neutrality and reasonableness. Compounding the confusion, *Jones*, our Circuit's first case to address forum analysis—and dealing with a city commission meeting to boot—treated that meeting as a designated, rather than a limited, public forum, and accordingly reviewed a content-neutral decision for narrow tailoring to a significant governmental interest. *Jones*, 888 F.2d at 1331. So, between *Jones*, *Rowe*, and

*Bloedorn*, we have three combinations of labels and tests here: *Jones*, a designated public forum with heightened scrutiny; *Rowe*, a limited public forum with heightened scrutiny; and *Bloedorn*, a limited public forum with reasonableness review.[8]

## C.

So where does that leave us?  Both parties agree that the trespass order here was content neutral.  McDonough, citing to *Jones*, argues that the Homestead city council meetings are a designated, or even traditional, public forum.  If so, the trespass order would need to be narrowly tailored in service of a significant governmental interest and leave open ample alternative channels of communication.  *Perry*, 460 U.S. at 45–46.  McDonough argues that this is the appropriate standard.  For the City's part, it prefers *Rowe*'s characterization of the meetings as a limited public forum.

---

[8] One more of our decisions merits mention.  In *Barrett v. Walker County School District*, we analyzed a restriction on the public's access to the "public-comment portions of" a school board's meetings.  872 F.3d 1209, 1219 (11th Cir. 2017).  *Barrett* concluded, citing to *Rowe*, that the public-comment sessions are limited public forums.  *Id*. at 1225 (citing *Rowe*, 358 F.3d at 802).  But while *Rowe* would have required even content-*neutral* restrictions to meet narrow tailoring in service of a significant governmental interest, *Barrett* required content-*based* restrictions to be only "viewpoint neutral and reasonable in light of the forum's purpose."  *Id*. (footnote omitted); *see Rowe*, 358 F.3d at 802–03.  Moreover, *Barrett* never cited *Jones*—which called the public-comment period of a city-council meeting a designated public forum—even though *Jones* was directly on point.  Perhaps that was because the parties had already agreed that the public-comment portion of the school board meeting was a limited, not designated, public forum.  *Barrett*, 872 F.3d at 1224.  But *Barrett* did not address, and thus could not resolve, the conflict in our precedents.

Even so, the City declines to endorse any particular standard for limited public forums, arguing that its actions did not violate the law no matter which test we apply.

The parties' uncertainty reflects the fact that our caselaw does not offer an easy answer. Under the Supreme Court's current framework, because the city council's meeting procedures limit the public comment period to matters "pertinent to the City," it would appear that the city council meeting is a limited public forum. *See Walker*, 576 U.S. at 215. In such a forum, the less exacting reasonableness analysis should apply, whether for content-based or content-neutral restrictions, so long as those restrictions are viewpoint neutral. *See Good News Club*, 533 U.S. at 106–07.

*Jones*, however, short-circuits our analysis. The city commission meeting there, which we deemed a designated public forum, was identical in all relevant respects to the one here, including that the public was invited to a city facility to speak only "on agenda items." *Jones*, 888 F.2d at 1331. Given that it was a designated public forum, we went on to apply the standards used for that kind of forum—content-based restrictions were subject to strict scrutiny, while content-neutral restrictions needed to be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Id.*

The prior-panel precedent rule directs one course: it is "the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the

Supreme Court." *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993). Yes, "a subsequent panel is not obligated to follow a prior panel's decision where an intervening Supreme Court decision establishes that the prior panel decision is wrong." *Id*. But we cannot comfortably say that *Jones* and *Crowder* were abrogated by the Supreme Court's subsequent change in its treatment of limited public forums, finalized in *Good News Club*.

For one thing, *Rowe*, a decision this Court issued after *Rosenberger* and *Good News Club*, applied the stricter legal test of *Jones*, rather than reasonableness review, to speech restrictions at a city council meeting. *Rowe*, 358 F.3d at 802–03. And no intervening Supreme Court precedents since *Rowe* explain the subsequent shift in the tests this Circuit has applied either to limited and designated public forums generally, or to speech restrictions in city council meetings specifically. For another, *Jones* and *Good News Club* agree on the test to be applied in a designated public forum—strict scrutiny for content-based restrictions, narrow tailoring in service of a significant governmental interest for content-neutral restrictions—even if they might disagree on what types of government-owned spaces fall under that label. Last but not least, neither *Good News Club* nor *Rosenberger* dealt with a city council meeting—unlike both *Jones* and *Rowe*.

That means all of our not-quite-reconcilable precedents are not-quite-overruled. There is no way to chart a new path through our caselaw consistent with all of our precedents unless we twist "a case in such a way as to avoid the more troublesome prospect of

dealing with the conflict of authority." *Hogan*, 986 F.2d at 1369. Because "we cannot distinguish the facts" of *Jones*, we are obligated to apply it as "the precedent of the first panel to address the relevant issue." *Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1227 (11th Cir. 2018).

## D.

According to *Jones*, the city council meeting here is a designated public forum, so we apply the standards relevant to such a forum. We see no reason to upset the parties' consensus that the trespass order was content neutral, because we conclude that the order fails even the test applied to content-neutral restrictions in a designated public forum.

*Jones* held that the government has a significant interest "in conducting orderly, efficient meetings of public bodies." 888 F.2d at 1332–33. Even assuming that the City's trespass order pursued this interest, it was not narrowly tailored to do so. Nor did it leave open ample alternative means for McDonough to speak.

By its terms, the order indefinitely barred McDonough from city hall, preventing him from attending all future city council meetings.[9] Wright informed McDonough that his ability to return

---

[9] McDonough at one point in his brief describes this order as a "prior restraint" on his speech, a characterization that the City challenges. In support, however, he cites only a Sixth Circuit case dealing with a citywide nighttime noise ordinance. *See Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 506 (6th Cir. 2001). The Sixth Circuit found that the challenged regulation was *not* a prior restraint because it was content neutral, narrowly tailored, and did not vest any city officials with unbridled discretion—rejecting

and speak depended on his writing a letter—unmentioned were to whom the letter should be sent and what it should say. This sweeping, indefinite ban on McDonough's attendance is not narrowly tailored—it "burden[s] substantially more" of McDonough's speech "than is necessary to further" the City's interest in avoiding disruption at its meetings. *Ward*, 491 U.S. at 799. The City was permitted to remove McDonough from the July meeting after he behaved disruptively. *See Jones*, 888 F.2d at 1333–34. It was not permitted, however, to ban him from all future meetings, offering relief and readmission only if he "wrote a letter"—an action described in such vague terms as to be functionally meaningless.

Nor were the City's proposed alternative channels for contacting the city council—email, physical mail, and phone calls—enough to preserve McDonough's First Amendment rights. Public city council meetings are just that—public. An attendee's interest in speaking may be as much to rally or inform other members of the public as to address the council members themselves. And it is certainly easier to hold the city council accountable in a public forum rather than a private one. The City's trespass order against McDonough thus fails the scrutiny applicable

---

a challenge often brought in the permitting or licensing context. *Id.* at 509. McDonough does not raise a similar substantive challenge in this appeal. In any event, we need not decide what amounts to a labeling dispute because prior restraint analysis already maps onto the tough standards that apply in traditional and designated public forums.

to content-neutral regulations for a designated public forum.[10] We reverse the district court on Count 2.

## IV.

Moving to McDonough's other claims, Counts 4 and 7 are state-law false arrest claims against the City of Homestead for his August disorderly conduct arrest and his September cyberstalking arrest. For these claims, "probable cause constitutes an absolute bar." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). Probable cause exists when "a reasonable officer could conclude that there was a substantial chance of criminal activity." *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (alteration adopted and quotation omitted).

## A.

The first question is whether the officers had probable cause to arrest McDonough for disorderly conduct. Florida law criminalizes conduct that constitutes "a breach of the peace or disorderly conduct." Fla. Stat. § 877.03. But the Florida Supreme Court has limited that law's application to unprotected speech—

---

[10] One issue related to the trespass order remains. The City argues that it cannot be held liable under Section 1983 because the order did not represent an official policy of the City. As the district court found, either Chief of Homestead Police Alexander Rolle made the decision to bar McDonough under the final policymaking authority vested in the police department by city ordinance, or Chief Rolle had delegated this authority to Sergeant Wright, who made the final call. Either way the City is liable under Section 1983 because a single decision by a final policymaker is sufficient for municipal liability. *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989).

words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *State v. Saunders*, 339 So. 2d 641, 644 (Fla. 1976) (alteration adopted and quotation omitted). Neither of those things even came close to happening. McDonough was arrested for swearing at Wright, flipping him the bird, and allegedly grabbing his crotch in the presence of a handful of peaceful onlookers, none of whom showed any reaction to his outburst.

Our disorderly conduct precedents instruct that assessing the existence of probable cause for a disorderly conduct arrest is a highly fact-intensive inquiry. But a few through lines in the doctrine dictate the outcome here. To start, mere words of anger, including profanity, directed at a police officer are not enough to sustain a disorderly conduct arrest. *See Alston v. Swarbrick*, 954 F.3d 1312, 1319 (11th Cir. 2020); *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997). Nor are obscene gestures, whether alone or combined with verbal antagonism. Raising one's middle finger or the equivalent is simply another way of saying "fuck you"—rude, but not illegal. *Davis v. Williams*, 598 F.2d 916, 919 n.5 (5th Cir. 1979);[11] *see Sandul v. Larion*, 119 F.3d 1250, 1252, 1255 (6th Cir. 1997); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).

Finally, the presence of bystanders does not transform otherwise lawful conduct and speech into incitement. As Florida

---

[11] Decisions by the former Fifth Circuit handed down before October 1, 1981 are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

courts have explained, "the mere fact that other people come outside or stop to watch what is going on is insufficient to support a conviction for disorderly conduct." *Barry v. State*, 934 So. 2d 656, 659 (Fla. Dist. Ct. App. 2006) (citing *Gonzales v. City of Belle Glade*, 287 So. 2d 669, 670 (Fla. 1973)). Incitement requires more: "some evidence that the crowd is actually responding to the defendant's words in some way that threatens to breach the peace." *Id.*

McDonough's actions may not have been a particularly polite or respectful way to behave in public. But his behavior, standing alone, does not provide probable cause for a disorderly conduct arrest. We reverse the district court on Count 4.

**B.**

By contrast, at the time of McDonough's second arrest, this time for cyberstalking, the City did have probable cause to believe that he had committed the crime. Cyberstalking is defined by Fla. Stat. § 784.048(1)(d) as conduct communicating "words, images, or language" to a particular person through email or other electronic communication, "causing substantial emotional distress to that person and serving no legitimate purpose." The statute omits "constitutionally protected activity such as picketing or other organized protests" from its ambit. *Id.* § 784.048(1)(b). Here, the City argues that McDonough's three blog posts—which identified and taunted a specific police officer, threatened to respond "swiftly and harshly [sic]" to further perceived provocations, and promised to "blast" the officer's home address—were enough to arrest him for cyberstalking.

An officer has probable cause for an arrest where the interpretation of an applicable criminal statute is "objectively reasonable," even if erroneous. *United States v. Braddy*, 11 F.4th 1298, 1308–09 (11th Cir. 2021). And that standard falls well short of what is required for a conviction. Though a close call, it was not unreasonable for these officers to regard McDonough's internet posts as threats against the named officer.

"True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence," and they have never been protected by the First Amendment. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (alteration adopted and quotation omitted). Disseminating a target's address, in conjunction with other evidence that the speaker intends harm to befall the target, can amount to such a threat. *See, e.g.*, *United States v. Turner*, 720 F.3d 411, 418–25 (2d Cir. 2013) (posts of several judges' photos and work addresses on extremist-linked website, alongside text saying the judges deserved to die, constituted true threats); *cf. United States v. White*, 698 F.3d 1005, 1013–16 (7th Cir. 2012) (post on a white supremacist website included a juror's photo, home address, and phone number); *Planned Parenthood of the Columbia/Williamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1071–80, 1085–86 (9th Cir. 2002) (en banc) (wanted-style posters sharing targets' photos and addresses). Regardless of whether McDonough's posts actually qualified as true threats, it was not unreasonable for the City's officers to believe that they did. And we agree with the district court's conclusion that his posts—especially the promise to

28                    Opinion of the Court                    22-11421

reveal the officer's home address—could objectively inspire substantial emotional distress in their target.

McDonough's last and best argument against his cyberstalking arrest is that three posts, made within fifteen minutes, do not constitute a "course of conduct" under the cyberstalking statute. The statute defines a "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short," and McDonough argues that his three posts should count as only one act. Fla. Stat. § 784.048(1)(b).

Florida courts have considered a similar issue—but not until four years after McDonough's arrest. In *Krapacs v. Bacchus*, a Florida appellate court found that tagging a target in repetitive social media posts over the span of four hours constituted a single act, rather than a series of acts. 301 So. 3d 976, 978–79 (Fla. Dist. Ct. App. 2020). By that standard, McDonough may be correct that his three rapid-fire posts should be considered a single act rather than a course of conduct. But whether probable cause exists depends on "the facts and circumstances within" the arresting officers' knowledge "at the moment the arrest was made." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). As of 2016, without the benefit of *Krapacs*, we cannot say that the City's view that McDonough's three separate posts constituted "a pattern of conduct composed of a series of acts over a period of time, *however short*," was objectively unreasonable. Fla. Stat. § 784.048(1)(b) (emphasis added). We affirm the district court on Count 7.

## V.

We now turn to the individual claims against the officers involved in McDonough's arrests.  Count 3 alleges that Wright violated McDonough's First Amendment rights by issuing the trespass order barring McDonough from future city council meetings.  Counts 5 and 6 allege that Wright and Garcia respectively violated McDonough's Fourth Amendment rights by falsely arresting him for disorderly conduct without probable cause.  The district court granted summary judgment against McDonough on the basis of qualified immunity on all three counts. We affirm on Count 3 but reverse on Counts 5 and 6.

"Qualified immunity offers protection for government officials, acting within their discretionary authority, who are sued in their individual capacities as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Collier v. Dickinson*, 477 F.3d 1306, 1307 (11th Cir. 2007) (footnote and quotation omitted).  Once the official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to show that there was a violation of a constitutional right and that the right at issue was clearly established when the violation occurred.  *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013).

Plaintiffs can make that showing in one of three ways.  *First*, they can point to a materially similar decision, whether from the Supreme Court, this Court, or the supreme court of the state in

which the case arose.  *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).  *Second*, they can show that a "broader, clearly established principle should control the novel facts of the case."  *Id.* (quotation omitted).  *Third*, they can convince us—though this happens only rarely—that the alleged conduct "so obviously violates the constitution that prior case law is unnecessary."  *Id.* (alteration adopted and quotation omitted).  Under the second and third methods, we look for obvious clarity: "a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent."  *Id.*

## A.

First, we consider whether Sergeant Wright was shielded by qualified immunity when he barred McDonough from city hall. Whatever else you could say about our earlier excavation of this Circuit's public forum precedents, it would be impossible to assert that any of it was "clearly established."  We thus affirm the district court's grant of summary judgment to Wright on Count 3— McDonough's First Amendment claim—on the basis of qualified immunity.

## B.

The answer looks different for the claims against the officers responsible for McDonough's disorderly conduct arrests.  For qualified immunity, "an officer need not have actual probable cause, but only 'arguable' probable cause."  *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010).  Officers can show

that arguable probable cause exists when "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Garcia*, 75 F.4th at 1186 (quotation omitted). The "arguable probable cause inquiry in a false arrest case is no different from the clearly established law inquiry." *Id*. at 1187.

Here, however, even that standard is not met. First, Sergeant Wright's arrest of McDonough for disorderly conduct was based on cursing, flipping the bird, and crotch-grabbing. Eleventh Circuit caselaw has long established that directing profane language toward police officers, whether or not in the presence of witnesses, does not constitute disorderly conduct. *Alston*, 954 F.3d at 1319; *Gold*, 121 F.3d at 1446.

What's more, expression remains protected by the First Amendment whether communicated through words or their physical equivalent. *Davis*, 598 F.2d at 919 n.5. That goes for raising the middle finger as well as other profane gestures like grabbing one's crotch. *See id*. Based on this Circuit's precedent, any reasonable officer would know that raising the middle finger is speech protected by the First Amendment.

Finally, as explained above, Florida law has clearly established that the mere presence of bystanders is not enough to provide probable cause for a disorderly conduct arrest without evidence that the actions "were more than annoying to those around them." *Gonzales*, 287 So. 2d at 670; *see Barry*, 934 So. 2d at 659. So the fact that there were bystanders does not rescue

32                          Opinion of the Court                    22-11421

Wright's qualified immunity claim.  For all these reasons, Wright did not have even arguable probable cause to arrest McDonough for disorderly conduct.

For his part, Garcia objects to being lumped in with Wright. After all, he says, he arrived on the scene only after McDonough had already been arrested.  It's true—an officer who participates in an arrest but lacks "the requisite information to put him on notice that an unlawful arrest was occurring or had occurred" cannot be held secondarily liable.  *Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013).  The problem for Garcia is that he was not a bit player.  He authored McDonough's arrest report, attesting that he had "just and reasonable grounds to believe and does believe" that McDonough had committed the crime of disorderly conduct.  To support the charge, he wrote that McDonough "grabbed his genitals," "raised his right middle finger" and "yelled, 'fuck you'!" And the basis for Garcia's knowledge?  He spoke to Wright and personally reviewed the City's surveillance tapes, which captured the incident (and show, to be candid, even less of a ground for arrest than Wright's already insufficient description of the events).

In other words, Garcia's understanding of McDonough's conduct was identical to Wright's.  If Wright should have known that there was no probable cause to arrest McDonough, the same goes for Garcia.  But Garcia nevertheless participated in the arrest and wrote the report while "fully aware" that the basis for the arrest was insufficient.  *See Wilkerson*, 736 F.3d at 980.  We thus

reverse the district court's qualified immunity dismissal on Counts 5 and 6.

\*        \*        \*

We affirm the district court's grant of summary judgment to the City on Count 7—the cyberstalking false arrest claim—and to Wright on Count 3—the First Amendment claim.  We reverse the grant of summary judgment to the City on Counts 2 and 4, the First Amendment and disorderly conduct false arrest claims, respectively.  We also reverse the grants of summary judgment to Wright and Garcia on Counts 5 and 6, the Fourth Amendment claims.  Accordingly, we remand the case to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 10, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-11421-JJ
Case Style:  James McDonough v. Carlos Garcia, et al
District Court Docket No:  1:19-cv-21986-FAM

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, <u>each party to bear own costs</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at <u>www.ca11.uscourts.gov.</u>

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1A Issuance of Opinion With Costs