

EDWARD G. GUEDES, MEMBER
eguedes@wsh-law.com

November 14, 2024

David J. Smith
Clerk of the United States Court of
Appeals for the Eleventh Circuit
56 Forsyth St. N.W.
Atlanta, GA 30303

      **RE:** *James McDonough v. Carlos Garcia, et al.,* **Case No. 22-11421**
            **Supplemental Letter Brief**

Dear Mr. Smith:

      The Court has asked the parties to address through supplemental letter briefing "[w]hether the City of Homestead's restrictions on James McDonough's speech (relating to Count II) are constitutional." The City respectfully suggests that the Court's articulation of the issue at least partly assumes certain facts about the trespass order issued by the City to Mr. McDonough that are unwarranted and potentially affect the answer to the question posed. Mr. McDonough was not trespassed from City Council meetings or restricted from speaking generally, but rather from entering City Hall.[1]

---

[1]     The City obviously is cognizant of the fact that Council Chamber is in City Hall and that lack of access to City Hall signifies lack of *physical* access to City Council meetings. The City raises this distinction in part to counter Mr. McDonough's consistent suggestion that the trespass order was in response solely to comments he made at the podium during the public meeting. That is not the case.

Mr. McDonough has consistently urged throughout this case that the trespass order issued to him upon his return to City Hall was an attempt by the City to prevent his making future comments to the City Council and reflected the City's disagreement with the content of his comments during the preceding month's City Council meeting. However, that is not so. Mr. McDonough was *asked to leave Council Chambers* because of the way he expressed himself during his public comments to the City Council.[2] In fact, a trespass order did not issue upon Mr. McDonough's leaving the Council Chamber. But Mr. McDonough did not peaceably leave Council Chamber. As he was being escorted out, Mr. McDonough shouted, "I am going to sue the shit out of you dumb ass." ECF No. 94, 3:08-3:13. Several individuals sitting in the meeting can be seen turning around to watch him as he yelled at Sgt. Wright while exiting. *Id.*; ECF No. 56-12, 71:1-72:15. Although Mr. McDonough has asserted that he did not "engage in any other form of behavior that disrupted or impeded the Council meeting," I.B. 4, in one of the videos he submitted to the district court (recorded by someone in Council Chamber), the foregoing comment can plainly be heard within Council Chamber. ECF No. 58, Exh. P.

As McDonough has acknowledged, once he was in the lobby of City Hall, he continued his disruptive *behavior*, shouting, "Now we got Homestead police officers again violating the First Amendment rights because they are fucking idiots and they don't know shit. Absolutely ridiculous." I.B. 4; ECF No. 94, 3:13-30. After consultation with the State Attorney's Office, the decision was made, based on Mr. McDonough's behavior on July 27, 2016, to issue a trespass warning to him upon his return to City Hall. ECF No. 64-6, Nos. 14-15; ECF No. 56-12, 28:22-30:16, 73:1-74:1. This decision was based on Mr. McDonough's perceived threat to Councilman Maldonado during his time at the podium and his subsequent actions

---

[2] Mr. McDonough abandoned his challenge to that initial action by the City and did not appeal any aspect of the City's application of its *decorum policy* to him. For this reason, as further explained herein, much of the case law Mr. McDonough cites relating to the enforceability of decorum policies and the City's recent changes to its decorum policy, as well as this Court's recent decision in *Moms for Liberty-Brevard County v. Brevard Public Schools*, 118 F.4th 1324 (11th Cir. 2024), which involved the inconsistent application of a school board's decorum policy, are inapposite. Unlike the record of inconsistent application of the Brevard school district's decorum policy, *id.* at 1333-38, there is no record of inconsistent application of the City Council's decorum policy in this case as to other speakers or individuals who engage in disruptive behavior.

(which included disruptive behavior and cursing) while exiting the Council Chamber and in the City Hall lobby. *Id.*

Upon his return to City Hall the following month, the following colloquy took place between Mr. McDonough and Sgt. Wright:

> Wright: Due to your actions and comments from the last meeting, and your behavior, you are now officially being trespassed from the City of Homestead City Hall until you get permission to come back.
>
> McDonough: Okay.
>
> Wright: Is that understood?
>
> McDonough: How do I get permission to come back?
>
> Wright: You have to write a letter, sir.
>
> McDonough: Can I get that in writing from you?
>
> Wright: It'll be a report written.
>
> McDonough: Okay. Alright.
>
> Wright: Have a nice day.
>
> McDonough: Can't wait to see you in the deposition, sir. You have a great one.

ECF No. 58, Exh. Q. Mr. McDonough did not ask for additional specifics, but instead, upon conclusion of their exchange, walked away. *Id.* As he did so, Mr. McDonough shouted, "I'm leaving buddy, bye-bye" and gave Sgt. Wright the middle finger. ECF No. 64-2, 160:21-24; ECF No. 58, Exh. Q, 0:50-1:07.

Sgt. Wright communicated to Mr. McDonough that the duration of the trespass order was "until you get permission to come back." Upon Mr. McDonough's inquiry, Wright explained the trespass order could be lifted by Mr. McDonough writing a letter to the City. Mr. McDonough sought no further clarification as to what that meant and made no attempt to write such a letter to anyone. Instead, he merely returned to City Hall to attend the December 2016 City Council meeting and was allowed access to City Hall. ECF No. 64-3, 241:7-242:7. There is no record evidence that Mr. McDonough subsequently attempted to return to City Hall and was denied access.

The trespass order in no other way precluded Mr. McDonough from communicating directly with any of the Council members either by writing to them or phoning them or meeting them anywhere other than City Hall, or from speaking or posting publicly regarding any issues he had with the City; neither did it interfere with his exercise of First Amendment rights except at City Hall. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 53 (1983) ("[T]he reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place. These means range from bulletin boards to meeting facilities to the United States mail. During election periods, PLEA is assured of equal access to all modes of communication. There is no showing here that PLEA's ability to communicate with teachers is seriously impinged by the restricted access to the internal mail system. The variety and type of alternative modes of access present here compare favorably with those in other non-public forum cases where we have upheld restrictions on access."); *United States v. Gilbert*, 920 F.2d 878, 886 (11th Cir. 1991) (determining that an "unwritten policy of excluding demonstrators from the portico area" was reasonable in part due to the "the availability of alternative channels of communication" because the "policy allows protesters to express their viewpoints fully in the unenclosed plaza area, which is located just a few feet from the entrance to the building and the portico area"); *Daniel v. City of Tampa*, 38 F.3d 546, 550 (11th Cir. 1994) (upholding the trespass after warning statute in part because the plaintiff had "unlimited access to the City-owned streets and sidewalks adjacent to the housing complex [as] an alternative means for distributing information to residents" (citing *Gilbert*, 920 F.2d at 886)). Given Mr. McDonough's behavior at the July 27, 2016, Council meeting and in the lobby of City Hall after being escorted out, the trespass order, which provided a mechanism for being lifted, was a reasonable restriction on Mr. McDonough's access to City Hall.

In that respect, the trespass order here differs from the complete bans analyzed in the cases previously cited by Mr. McDonough. For example, in *Reza v. Pearce*, 806 F.3d 497 (9th Cir. 2015), the State Senate President (Pearce) banned Mr. Reza, who had been "loud" in an overflow room, watching Senate proceedings along with

other similarly "loud" individuals, from entering the Senate Building.[3] One officer testified that he told the Senate President there was no reason to remove any audience members, *id.* at 504, and one senator, Senator Gallardo, testified through affidavit that he never saw Mr. Reza engage in disruptive behavior, unlike the undisputed record here establishing Mr. McDonough's behavior. *See id.* at 501. The ban provided no mechanism for obtaining relief from its effects. Because of the ban, Mr. Reza was arrested and jailed when, two days later, he tried to enter the building to meet with Senator Gallardo. *Id.* Under the foregoing circumstances, the Ninth Circuit concluded there were factual disputes as to whether the ban, while content-neutral, was "reasonable," and reversed summary judgment. *Id.* at 505.

In *Brown v. City of Jacksonville, Fla.*, 2006 WL 385085 (M.D. Fla. Feb. 17, 2006), the Jacksonville city council president imposed a ban against Ms. Brown that specifically targeted her *speaking* before the city council after she behaved disruptively during a prior council meeting, as opposed to a physical trespass from the city hall, like here. *Id*. at **1-2. The ban was for "seven City Council cycles" or almost three months. *Id.* at *2. The opinion does not indicate that there was any mechanism available for lifting or shortening the ban.

In *Kugler v. Bd. of Educ. of the City of Chicago*, 2017 WL 3581176 (N.D. Ill. Aug. 18, 2017), the school board banned Mr. Kugler from *all* school board property "indefinitely, without any established mechanism for lifting the ban," because of his conduct during grievance hearings and threatening emails he sent. *Id.* at **6-7, 8. In fact, the court went on to describe the ban as being "for life" and without any recourse. *Id.* at *9. This ban effectively prevented Mr. Kugler from engaging in any of his union activities on behalf of himself and others anywhere in the school district.[4] *Kugler* is inapposite.

---

[3]  The opinion indicates that the Senate President initially imposed an "indefinite ban" on Mr. Reza, *id.* at 505, but goes on to indicate that, after Mr. Reza's arrest, a general rule was adopted to ban disruptive attendees for two weeks and repeat offenders for 60 days. *Id.* at 504. The opinion states "it is unclear if these regulations modified the indefinite bar applicable to Reza." *Id.* at 505.

[4]  The *Kugler* court granted a preliminary injunction because it believed Mr. Kugler had a "greater than negligible chance" of prevailing on the merits. *Id.* at *10. That is certainly not the injunction standard in this Circuit. *See, e.g., Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022) (noting a preliminary injunction may be granted only if the movant shows a "substantial

The same may be said of *McBreairty v. Sch. Bd. of RSU 22*, 616 F. Supp. 3d 79 (D. Me. 2022). There, the ban from all "school-related meeting or function," whether in person or electronically, lasted from May 4, 2022, until December 31, 2022, or roughly nine months. *Id.* at 88. When Mr. McBreairty attempted to attend a meeting during that timeframe, he was further "forbidden to enter all [school] buildings and grounds." *Id.* The district court "questioned" whether the ban was viewpoint-neutral and concluded the eight-month ban was not reasonable, given that the individual did not "raise his voice or become disruptive or disorderly" and yet was being banned from "all of his future school-related speech on school grounds for eight months." *Id.* at 96. The opinion does not indicate that there was any mechanism for obtaining relief from the ban.[5]

The City is unaware of any decision that has directly determined that a trespass order comparable to the one at issue here—where the trespassed individual has available (but does not invoke) a mechanism for having the order lifted—has been found constitutionally unreasonable. Because Mr. McDonough never availed himself of the option to obtain relief from the trespass order, there is no record basis to conclude that the City behaved unreasonably in issuing the trespass order.[6]

Restrictions affecting speech are constitutional if they "are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP*

---

likelihood of success on the merits") (citing *Gonzalez v. Gov. of Georgia*, 978 F.3d 1266, 1270-71 (11th Cir. 2020)).

[5]     Mr. McDonough's prior reliance on *Huminski v. Corsones,* 396 F.3d 53 (2d Cir. 2005), is unjustified. In that case, the ban "broadly prohibited Huminski's presence in and around certain state courthouses" in Vermont unless he was the subject of a court order directing him to appear. *Id.* at 62-65. The analysis was driven by exclusion from court proceedings and its impact on Mr. Huminski's ability to report on the conduct of litigants and judges. *Id.* at 84. The trespass notices "prohibit[ed] indefinitely any and all expressive activity he might want to engage in and around Rutland state courthouse." *Id.* at 92. There was no indication that the trespass orders provided a mechanism for obtaining relief from them.

[6]     If Mr. McDonough *had* written a letter and the City had rejected it because it was not addressed to the correct individual or did not contain specific language, then the reasonableness of the trespass order might be ascertainable. Or if he had even inquired as to whom the letter should be addressed and the City refused to provide the information, the posture of this case might be different. But neither situation arose and Mr. McDonough returned to attending City Council meetings in December of that year without incident.

*Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). While Mr. McDonough may suggest that the trespass order was content-driven, on its face, the trespass order issued by Sgt. Wright (as reflected by the colloquy) draws no distinction between different subject matters of speech in which Mr. McDonough might engage during a visit to City Hall. As for the relevant forum, it is primarily City Hall, and then only incidentally, City Council meetings. Mr. McDonough has never focused on the distinction in purpose between City Hall and a City Council meeting. City residents visit City Hall for a host of reasons, some political and free speech-related, but many others are not. Residents visit City Hall for many administrative reasons that do not implicate the exercise of free speech. If a resident intent on paying a utility bill comes to City Hall and encounters an individual engaging a profanity-laden tirade in the lobby, such behavior would be disruptive to the ordinary conduct of City business, not only for the City but for the resident as well.

For example, in *Wright v. City of St. Peterburg*, 833 F.3d 1291 (11th Cir. 2016), a case involving a First Amendment challenge, this Court upheld the validity of a one-year trespass order prohibiting the complainant from visiting a public park, a traditional public forum for First Amendment purposes. The complainant in *Wright* was a minister and advocate for the poor and the homeless. *Id.* at 1293. He would use the public park "for his ministerial outreach and advocacy work because many poor and homeless people visit it. He also organizes and attends demonstrations, ranging from 'sleep-outs' for the homeless to human rights marches, which have been held in Williams Park." *Id.* As the Court observed, "There is no question that the First Amendment protects Wright's ministerial outreach and political speech." *Id.*

The plaintiff, however, was arrested in the park and charged with interfering with a police investigation and resisting an officer without violence. *Id.* He had approached officers who were questioning a man in the park, told them to stop harassing the man, and asked what the man had done wrong. *Id.* Rather than respond, the officers told him to back off and not interfere. When the plaintiff did not step back, he was arrested. *Id.* In connection with that arrest, a trespass order issued to the plaintiff banning him from entering the park for one year. *Id.* at 1294. "The prohibition made his ministerial outreach more difficult because he could no longer interact with people inside the park. The trespass warning also prevented him from attending a press conference on police brutality held inside the park the day after his

arrest." *Id.* The plaintiff challenged the trespass ordinance on First Amendment grounds, claiming facial and as-applied unconstitutionality. *Id.* The Court rejected the challenges, observing that "[s]imply because the trespass warning incidentally burdened Wright's First Amendment activities does not mean that Ordinance § 20–30 is subject to First Amendment scrutiny…." *Id.* at 1296.

Admittedly, the plaintiff in *Wright* could not "show that he received the trespass warning because he engaged in conduct with 'a significant expressive element' or conduct that was 'intimately related to expressive conduct protected under the First Amendment.'" *Id.* at 1297 (citing *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 & n.3 (1986)). Instead, he was arrested for interfering with a police investigation in the park after expressing his concern for the individual being questioned and demanding an explanation. But the same may be said of Mr. McDonough's *conduct* in the lobby of City Hall and as he exited Council Chamber; it did not have a "significant expressive element" protected by the First Amendment, at least not in the context of the forum in which it occurred. *See id.* at 1296 n.5 (observing that the trespass warning was not "imposed on the basis of an advance determination that the plaintiff's expressive conduct was prohibited—indeed, his trespass warning had nothing to do with any expressive conduct at all: (alterations adopted)).

In response to the *Wright* plaintiff's assertion that the one-year ban "impermissibly burdened his First Amendment activities," the Court concluded, "[A]ny burden was incidental and that incidental burden was mitigated by the fact that the ordinance allowed him to enter the sidewalks around Williams Park even while his trespass warning was in effect." *Id.* at 1297. He could also visit other parks in the city. *Id.*; *see also id.* 1296 n.5 (noting that "[t]he trespass warning allowed the plaintiff to continue his expressive activities in other public areas").  The same may be said of Mr. McDonough's trespass order in terms of how it limited his ability to communicate with elected officials or otherwise express his displeasure with any City actions or policies.

Finally, to the extent Mr. McDonough challenges the sufficiency of the trespass warning itself, that challenge is more appropriately asserted as a due process challenge (which Mr. McDonough did not assert), rather than a First Amendment

challenge. *See, e.g., Catron v. City of St. Peterburg*, 658 F.3d 1260, 1268-69 (11th Cir. 2011).

For these reasons, the City respectfully urges the Court to conclude that the Mr. McDonough's trespass from City Hall, as opposed to from speaking in Council Chamber, was a reasonable restriction under the circumstances and the purpose of the forum (City Hall). The Court should affirm the summary judgment as to Count II.

Respectfully,

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.

Edward G. Guedes

cc: Alan J. Greenstein, Esq.

## *McDonough v. City of Homestead*
## Case No. 22-11421-J

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

**A. Interested Persons**

Appellees, the City of Homestead, Carlos Garcia and Garland Wright, respectfully submit this list of persons or entities that may have an interest in the outcome of this review:

**Appellant (and its currently known principals or other affiliated persons)**

1. James Eric McDonough.

**Appellees**

2. City of Homestead.

3. Carlos Garcia.

4. Garland Wright.

**Trial Judge, Attorneys, and Law Firms**

5. Hon. Federico A. Moreno (|District Judge).

6. Weiss Serota Helfman Cole & Bierman, P.L. (Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

7. Edward G. Guedes, Esq. (Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

8. Matthew H. Mandel, Esq. (Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

9. Anne R. Flanigan, Esq. Counsel for Appellees, City of Homestead, Carlos Garcia and Garland Wright).

10. Alan Greenstein, Esq. (Counsel for Appellant, James Eric McDonough).

11. Alan Greenstein, P.A. (Counsel for Appellant, James Eric McDonough).

**B. Corporate Disclosure Statement**

Appellee, City of Homestead, is a municipal corporation of the State of Florida, and as a result, has no parent company, subsidiary, or affiliate company that has issued shares to the public.

                                                 /s/ *Edward G. Guedes*
                                                    Edward G. Guedes